

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

April 14, 2014

Hon. Vincent L. Briccetti
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, NY  10601

      Re:  SENTENCING MEMORANDUM
            United States v. McCrimon
            <u>Docket No. 13-CR-324-01 (VB)</u>

Dear Judge Briccetti:

      Please accept this letter as the Government's sentencing memorandum in the above matter.  For the reasons stated below, the Probation Officer's calculations of the defendant's offense level, criminal history category and imprisonment and fine ranges are correct.  The Government respectfully submits that, upon consideration of the factors set forth in 18 U.S.C. § 3553(a), a sentence within the applicable Guidelines range of 63 to 78 months would be reasonable and appropriate.

<u>The Offense Conduct</u>

      Defendant Joseph McCrimon robbed a Wells Fargo bank in Ardsley with his co-defendant, James Sherrod, on March 29, 2013. The robbery was McCrimon's idea.  According to Sherrod's post-arrest statement, McCrimon had proposed earlier that day that the two men commit a robbery. Presentence Report ("PSR") at ¶ 13; Ex. 1 at 2-3; <u>see</u> n.2 <u>infra</u> and accompanying text.  McCrimon asked Sherrod in substance to help him "get this money" and further told Sherrod in substance that a robbery would be easy, that McCrimon had glasses and a band aid to use as a disguise and that "it's been done before."  Ex. 1 at 3.

      The circumstances indicate that Sherrod's account of McCrimon's statements is credible.  Sherrod knew that he and McCrimon were the only witnesses to their conversation.  <u>Id</u>. at 3.[1]  He also knew that his knowledge of McCrimon's plan prior to

---

[1] McCrimon's friend, Shatara Coney-Edwards accompanied the two men during their drive from New York City to Ardsley that day.  Sherrod said that Coney-Edwards was parking the car when he and McCrimon discussed committing a robbery.  <u>Id</u>. at 3.  Coney-Edwards was unconscious during and after the robbery and was not charged.

the robbery was relevant to his culpability, as evidenced by his initial denial of any such knowledge, id. at 2, followed by his incremental moves toward his final admission that he had agreed with McCrimon's proposal to commit a robbery before the men had left Sherrod's home that morning. Id. at 2-3.[2] Sherrod's reluctant final statement is credible, given that he clearly understood at the time that it was against his penal interest. Further, Sherrod's statement is corroborated by the fact that McCrimon had robbed another bank 16 days before the Ardsley robbery using glasses and band-aids as a disguise, as discussed in more detail below.

The two men and Coney-Edwards eventually drove to Ardsley. At McCrimon's direction, Sherrod stopped the car across the street from the Wells Fargo branch. PSR at ¶ 13. McCrimon then walked into the bank, wearing a fur hat, black knitted gloves and band-aids on his face. PSR at ¶ 9. He also wore a bag resembling a camera bag around his neck. Id. He handed the teller a note which stated "you got 15 seconds [sic] to give me 20,000 of [sic] this device is going off." Id.; Ex. 2. The teller gave McCrimon $10,000 in cash. PSR at ¶ 9. After McCrimon returned to the car with the money, he urged Sherrod to drive away. Ex. 1 at 2. A police officer in an unmarked police car saw McCrimon changing his clothes in the car and signaled Sherrod to stop. PSR at ¶ 10. Sherrod stopped, waited a moment, and then took off at a high rate of speed. Id. at ¶¶ 10-11. He later said that McCrimon urged him to take off and continued to urge Sherrod on as they drove away at a high rate of speed. Ex. 1 at 2.

Sherrod then drove the getaway car containing himself, McCrimon and Coney-Edwards at speeds at times exceeding 100 miles per hour and in the opposite lane of traffic at times. PSR at ¶ 11. Sherrod struck one vehicle during the chase and ultimately crashed the car. Id. McCrimon and Sherrod then fled on foot until they were later caught by the police. Id. at ¶¶ 11-13.

---

[2] Sherrod initially claimed that he was unaware that McCrimon planned to commit a robbery until after McCrimon had robbed the bank. Ex. 1 at 2. He later revised his statement to claim that he was unaware of McCrimon's plan to rob the bank until five minutes before the robbery. Id. He then revised his statement to say that he learned about McCrimon's plan when the two men were in Brooklyn, their first stop after they left Sherrod's house in Queens. Id. at 1-2. Sherrod then admitted that he knew of McCrimon's plan before the two men left his house. Id. at 3.

The Offense Level Should Be Increased by One
Level to Reflect McCrimon's Robbery of the Hudson
Valley Bank in Mount Vernon on March 13, 2013

   McCrimon also robbed the Hudson Valley Bank in Mount
Vernon on March 13, 2013, sixteen days before his robbery of the
Wells Fargo in Ardsley.  He stipulated in his plea agreement
that he was responsible for the additional $5,000 in loss, which
amount represents his proceeds from the Hudson Valley robbery.
That resulted in his offense level being increased by one level.
PSR at ¶ 27.  Despite his stipulation, the defendant now claims
that he did not rob the Hudson Valley Bank.  PSR at ¶ 15, n.1.[3]

   The evidence shows he did.  In addition to his
stipulation in May 2013 that he did, in fact, rob the Hudson
Valley Bank, the Government has photographs of the defendant
robbing that bank.  Exhibits 3 and 4 show the defendant robbing
the Hudson Valley Bank.  The photographs show the defendant
wearing band-aids on his face as a disguise, just as he did in
the Ardsley robbery.  Ex. 5 (photograph of defendant robbing
Ardsley Wells Fargo).[4]  Further, the photographs show the
defendant wearing a fur hat in the Mount Vernon robbery.  He
wore what appears to be the same fur hat in the Ardsley robbery.
Ex. 5; ex. 6 (photograph of fur hat seized by Ardsley Police).
The defendant wore dark sunglasses during both robberies.  Exs.
3-5.  In addition, one of the Mount Vernon tellers reported that
the defendant wore black gloves during the robbery there.  Ex.
7.  at 1.  The defendant also wore black gloves during the
Ardsley robbery.  Ex. 5; see Ex. 8 (black gloves found in
getaway car seized by Ardsley Police).  The fact that the
defendant wore the same unique disguise -- the fur hat, the
band-aids, the glasses and the black gloves -- in both robberies
confirms what the photographs already show:  the defendant
committed both robberies.  The unique disguise is essentially
the defendant's signature on both crimes.

   The defendant also admitted to Sherrod that he had
committed a robbery using this disguise in the past. As noted
above, McCrimon told Sherrod on the morning of the day they
robbed the Ardsley bank that a robbery would be easy, that

_____

[3] By now denying that to which he had stipulated, the defendant has breached
his plea agreement.  Having done so, the defendant has freed the Government
from its agreements and obligations under the plea agreement, including its
agreement that the defendant's offense level should be reduced for acceptance
of responsibility and its agreement not to prosecute him for the Mount Vernon
robbery.  United States v. Cimino, 381 F.3d 124, 127 (2d Cir. 2004).

[4] The Government has the video of the Ardsley robbery that is in color and is
of better quality than the photograph.  The Government will make this video
available upon request.

McCrimon had glasses and a band aid to use as a disguise and that "it's been done before."  Ex. 1 at 3.

Two of the Mount Vernon tellers estimated the robber's height to be from 5'5" to 5'8".  The defendant is actually much taller.  His drivers' license states he is 6'3".  Bank tellers who are victims of robberies often give inaccurate descriptions of robbers, which is probably due to the shock and fear resulting from being robbed.  The robber depicted in the photographs of the Mount Vernon robbery does not appear to be as short as the tellers describe.  Regardless, the photographs are of the defendant and  the tellers' inaccurate descriptions of the defendant do not change any of the above facts or conclusions.

This evidence proves by a preponderance that the defendant robbed the Hudson Valley Bank on March 13, 2013.  His offense level should be increased by one level to reflect the additional $5,000 in proceeds he received from robbing this bank.

The Offense Level Should Be Increased
Based the Defendant's Reckless Flight

McCrimon's offense level should be increased by two levels based on his reckless flight from the police following the robbery.  Section 3C1.2 of the Guidelines provides that "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," the offense level should be increased by two levels.  Here, Sherrod's reckless operation of the getaway car was reasonably foreseeable to McCrimon.  In fact, McCrimon was the one who directed it.

This Court has already found that Sherrod's actions in driving the getaway car in such a reckless manner warranted a two level increase in Sherrod's sentence.  In doing so, the Court noted how Sherrod drove at high speeds through populated areas, at times in the opposing lane, and how Sherrod forced the police officer to give chase.  In doing so, Sherrod recklessly created a risk of at least serious bodily injury to Coney-Edwards (who was unconscious in the back seat), the police officer and nearby motorists.

McCrimon is liable under the Sentencing Guidelines for Sherrod's and his reckless flight.  For the reckless flight enhancement to apply to McCrimon, Sherrod's reckless driving must be:  1) in furtherance of the jointly undertaken criminal activity; and 2) reasonably foreseeable to McCrimon.  U.S.S.G. §

1B1.3. Sherrod's reckless driving was clearly in furtherance of the robbery, as it was the flight from the robbery. It was also reasonably foreseeable to McCrimon. Flight from a bank robbery by car is likely to involve reckless driving that would endanger others, particularly in a populated area such as Ardsley. Further, Sherrod has said that McCrimon urged him on and told him to continue fleeing after the police officer signaled them to stop. Ex. 1 at 2. Sherrod's statement is corroborated by the undisputed fact, described in the PSR, that he did, in fact, stop, wait a moment and then drive away at a high rate of speed. It was during that moment of hesitation after Sherrod stopped that McCrimon urged him to continue fleeing. Given that McCrimon urged Sherrod to flee from a police officer, it was reasonably foreseeable to him that Sherrod would then drive in a reckless manner to do so.

For these reasons, McCrimon's offense level should be increased by two levels for reckless flight pursuant to U.S.S.G. §§ 3C1.2 and 1B1.3.

The Offense Level Should Be Increased
Because the Defendant Possessed a
Dangerous Weapon During the Offense

During the Ardsley robbery, McCrimon created an objectively reasonable belief by the tellers that he possessed a bomb. In his note, he referred to "this device" that would "go[] off" if the tellers did not give him money. Ex. 2. It would be reasonable for the tellers to conclude that "this device" referred to the bag McCrimon was visibly wearing around his neck. PSR at ¶ 9. Based on McCrimon's demand for money and his reference that the "device" would "go[] off" if he did not receive the money, it would be reasonable for the tellers to conclude that the bag contained an explosive device that could inflict serious bodily injury. Accordingly, McCrimon's offense level should be increased by three levels because he possessed a "dangerous weapon" during the offense as those terms are defined in the Sentencing Guidelines. U.S.S.G. § 2B3.1(b)(2)(E).

U.S.S.G. § 2B3.1(b)(2)(E) provides for a three level enhancement "if a dangerous weapon was brandished or possessed" during the offense. An object is a "dangerous weapon" under this subsection if "the defendant used the object in a manner that created the impression that the object was an instrument capable of inflicting death or serious bodily injury (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." U.S.S.G. § 2B3.1, Application Note 2(B). The object does not need to be an actual weapon. The type of object a defendant uses is irrelevant as long that

it creates an objectively reasonable belief that it is capable of inflicting death or serious bodily injury.  <u>United States v. Stitman</u>, 472 F.3d 983, 987 (7th Cir. 2007); see <u>United States v. Laughy</u>, 886 F.2d 28, 30 (2d Cir. 1989)(inoperable pellet gun is "dangerous weapon"); <u>Gurses v. United States</u>, 1996 WL 487954 at *5 (S.D.N.Y. 1996)(fake hand grenade); see also <u>United States v. Rodriguez</u>, 301 F.3d 666 (6th Cir. 2002)(styrofoam box is a "dangerous weapon" when robber claimed it contained a bomb); <u>United States v. Hart</u>, 226 F.3d 602 (7th Cir. 2000)(same with brown paper bag); <u>United States v. Buckley</u>, 192 F.3d 708, 709-10 (7th Cir. 1999) (same with briefcase).  There need not even be an actual object; a robber's creation of an objectively reasonable belief by his victims that he possesses a dangerous weapon justifies the enhancement.  <u>United States v. Bates</u>, 213 F.3d 1336, 1338-39 (11th Cir. 2000)(enhancement applied to robber who reached into his waist band).  A sentencing enhancement is appropriate when a robber creates an impression that he possesses a dangerous weapon due to the resulting increased risk of a violent or potentially dangerous reaction by police or bystanders and due to the fear that the robber thereby instills in his victims.  See <u>Gurses</u>, 1996 WL 487954 at *5, quoting <u>McLaughlin v. United States</u>, 476 U.S. 16, 17-18 (1986).  That is exactly what McCrimon did.

For these reasons, McCrimon's offense level should be increased by three levels.

A Sentence Within the Guidelines Range
Of 63 to 78 Months Would Be Reasonable

The factors in Section 3553(a) support the conclusion that a sentence within the advisory guideline range would be reasonable and appropriate in this case.

The PSR notes that the defendant is an "'intellectually impaired man' who functions within the 'Extremely Low' range of intelligence."  PSR at ¶ 65.  The Government does not dispute that conclusion or any of Dr. Goldstein's observations as described in the PSR.  The Government also does not dispute that the Court must consider this information as part of the "history and characteristics of the defendant" under U.S.S.G. § 3553(a)(1).

The defendant's limited intellectual abilities, however, have not hindered his abilities to plan and execute violent crimes, to persuade others to commit crimes with him or to direct another in committing those crimes.  McCrimon thought of the plans to rob both banks, developed the disguise and carried out the robberies.  He did it for the same reason others rob

banks -- as he told Sherrod, he thought it was an easy way to get money. Ex. 1 at 3. He was also able to persuade Sherrod to rob the Ardsley bank with him. Further, between McCrimon and Sherrod, McCrimon was in charge of the Ardsley robbery. It was McCrimon who thought to rob the bank and who chose the bank to rob and the time and manner in which they would rob it. It was McCrimon who directed Sherrod to pull over and wait while he robbed the bank. It was McCrimon who directed Sherrod in the reckless flight and persuaded him to flee from a police officer even after Sherrod had stopped the car. McCrimon's demonstrated abilities to commit violent crimes for money, to recruit another to commit violent crimes with him and to direct another in the execution of those crimes shows that his limited intellect does not prevent him from being as much of a danger to the community as others who, like him, have a violent criminal history and who have committed multiple bank robberies. McCrimon's limited intellect should, therefore, not be a leading factor in determining a reasonable sentence for this offense. There is no correlation between the defendant's limited intellectual ability and his violent acts such that a variance would be warranted.

The history and characteristics of this defendant show that he is likely to be a recidivist. The defendant did not adjust well to parole from his prior manslaughter conviction. PSR at ¶¶ 38-41. Further, his acceptance of responsibility for the conduct that led to his manslaughter conviction is, at the very least, insincere, as he minimized his conduct that led to another's death to an incredible degree. Compare PSR at ¶ 39 (McCrimon pulled out a gun and shot his victim) with ¶ 40 (McCrimon claims gun fell out of his pocket and "accidentally fired" when his victim reached for it). Similarly, the defendant has denied committing the Mount Vernon robbery, even after he had admitted to it. The Court of Appeals has found that "a defendant's admission of responsibility or expression of contrition 'is often a significant first step towards his rehabilitation . . . .' Admission of guilt thus may be properly be taken into account in determining what sentence is needed to achieve rehabilitation." United States v. Parker, 903 F.2d 91. 105 (2d Cir. 1990), quoting Smith v. Wainwright, 664 F.2d 1194, 1996 (11th Cir. 1981). McCrimon's denial of the Hudson Valley robbery is no different than his unbelievable account of his manslaughter conviction and shows that he has not taken that "significant first step towards his rehabilitation." Because McCrimon is an unlikely candidate for rehabilitation, the need for punishment, specific deterrence and protection of the community is greater.

The nature and circumstances of the offense also demonstrate the need for a Guidelines sentence. While a bank

robbery is always a serious offense, this robbery is particularly serious due to the defendant's dangerous and reckless flight from the police. The defendant exposed numerous other motorists and bystanders in the area, as well as the police officer who gave chase, to a significant risk of injury at the least. Furthermore, the defendant committed two bank robberies within a sixteen day period and has a violent criminal history. A sentence within the applicable Guidelines range is therefore necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to deter the defendant and others and to protect the public from further crimes of the defendant.

The Court Should Impose Restitution
For the Damage to the Getaway Car

The getaway car driven by Sherrod was damaged in the initial crash at the traffic light and the final crash when Sherrod ran off the road. The damage cost $10,880.20 to repair. Ex. 9 (estimate of damage). The car is owned by Enterprise Holdings, 1802 Petracca Place, Whitestone, New York 11357. We have been attempting to learn if Enterprise had recovered any of this amount from an insurance company.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/
_____
James McMahon
Assistant United States Attorney
Telephone: (914) 993-1936

cc: Andrew Rubin, Esq.

Katrina Minus-Shepard
United States Probation Officer