145EMCCmsS                    Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              13 Cr. 324(VB)
                                                  Sentence
5   JOSEPH McCRIMON,

6                Defendant.

7   ------------------------------x

8                                          May 14, 2014
                                           2:35 p.m.
9                                          White Plains, N.Y.

10  Before:

11          THE HONORABLE VINCENT L. BRICCETTI,

12                                         District Judge

13                      APPEARANCES

14  PREET BHARARA
        United States Attorney for the
15      Southern District of New York
    JAMES F. McMAHON
16      Assistant United States Attorney

17

    ANDREW A. RUBIN
18      Attorney for Defendant

19

20

21

22

23

24

25

                MARY M. STATEN, CSR, RPR, RMR
                      (914) 390-4027

145EMCCmsS                          Sentence

1

2              THE DEPUTY CLERK:  United States of America against

3    Joseph McCrimon.

4              Will counsel please note their appearance for the

5    record.

6              MR. McMAHON:  Yes.

7              Good afternoon, your Honor.

8              Jay McMahon, Assistant U.S. Attorney, for the United

9    States.

10             MR. RUBIN:  Good afternoon, your Honor.

11             Andrew Rubin for Joseph McCrimon.

12             THE COURT:  Good afternoon, everybody.

13             Have a seat.

14             All right.  This matter is on for sentencing today,

15   the defendant having pleaded guilty to one count of bank

16   robbery.  That's Count Two of Indictment 13 Criminal 324.

17             I've reviewed the following materials in preparation

18   for sentencing:  Presentence report dated April 10th, 2014,

19   prepared by Probation Officer Katrina Minus-Shepard.  Plea

20   agreement dated April -- excuse me -- May 8th, 2013.

21   Sentencing letter submitted by Mr. Rubin dated May 9th, 2014.

22   And attached to that letter were a number of materials,

23   including a psychiatric evaluation dated January 12th, 2014,

24   prepared by Dr. Allen Goldstein.  There are also letters dated

25   September 8th, 2013, from Quanda Moore, July 29th, 2013, from

145EMCCmsS                    Sentence

1    Rasheeda Barzey, B-A-R-Z-E-Y.  There is an undated letter

2    from -- I think it's Hasley DeRosina.

3             Let me just check that.

4             MR. RUBIN:  That's correct, Judge.

5             THE COURT:  Okay.  I've also received two letters from

6    the government, one dated April 14th, 2014, and the second one

7    dated May 12th, 2014.  I've reviewed all those materials.  I

8    also previously received letters from Ms. Barzey, which I think

9    is identical to the one that's attached to Mr. Rubin's

10   submission.  Although attached to that previous letter, which I

11   received back in August of last year, there are materials

12   attached.  In other words, Ms. Barzey's letter has attached

13   documents.

14            The attachments are not part of the attachments to

15   your letter, Mr. Rubin.

16            MR. RUBIN:  Judge, I think I'm familiar with what

17   those documents are.

18            THE COURT:  I'm going to show it to you, just to make

19   sure you have it.  But the main part of the letter is the same.

20   It's the attachments that are different, which are basically

21   Social Security related.

22            MR. RUBIN:  Documents.

23            THE COURT:  Documents, yes.

24            And then, also, I had previously received a letter

25   from Ms. DeRosina.  I also had previously received a letter

1    from Lillie Mae Louise Wheeler.

2            MR. RUBIN:  That one, I don't believe I have, Judge.

3            THE COURT:  All right.  Well, you can look at it.  I'm

4    going to give it to you right now.

5            And then, again, another copy of the letter from

6    Quanda Moore.

7            There is a lot of highly personal information

8    regarding Mr. McCrimon, and also information regarding his

9    emotional issues in here.  So my intention is to docket all

10   these letters under seal.

11           MR. RUBIN:  Thank you, Judge.

12           THE COURT:  I want to make these part of the record,

13   but do it under seal, unless you have an objection to that.

14           MR. RUBIN:  I don't, your Honor.

15           THE COURT:  And the same thing with your letter of

16   May 9th.  I don't think you filed it on ECF.

17           MR. McMAHON:  I didn't file it on ECF for that very

18   reason, your Honor.

19           THE COURT:  All right.  Well, I'll file it, but I'll

20   file it under seal.

21           Let me just have both lawyers look at these.  I think

22   most of what's in there, you've seen before.  Just let me make

23   sure there is nothing in there that you haven't seen before, or

24   if there is, that you've had an opportunity to review it.

25           (Pause)

1          THE COURT:  And just so we're clear, I think those

2    letters that I'm showing you now came to me directly.  They did

3    not come from Mr. Rubin or Mr. Rubin's predecessor on the case.

4    They came just directly from those people.

5          MR. RUBIN:  The only thing I haven't seen, Judge, I

6    believe, is Ms. Wheeler's.  If I could just have an opportunity

7    to read that.

8          THE COURT:  Of course.  Absolutely.

9          (Pause)

10          MR. RUBIN:  Thank you, Judge.

11          I think I'm going to ask that this be considered as

12    part of my -- that this one letter be added to my sentencing

13    submission.

14          THE COURT:  Well, I mean, effectively, it is, because

15    I'm considering everything.  Everything I've just said on the

16    record I've reviewed and is being considered by me in

17    connection with sentencing.

18          So you're going to give that package back to my Clerk,

19    and I'll have all of it docketed under seal.

20          MR. RUBIN:  Thank you, your Honor.

21          THE COURT:  We'll put it in one envelope.

22          All right.  And you've reviewed this, as well,

23    Mr. McMahon?

24          MR. McMAHON:  I have, your Honor.

25          THE COURT:  Okay.  Has anything else been submitted

1   that I failed to mention?

2           Mr. McMahon?

3           MR. McMAHON:  Not from the government.

4           THE COURT:  Mr. Rubin?

5           MR. RUBIN:  Not to my knowledge.

6           THE COURT:  Okay.  Mr. Rubin, have you read the

7   presentence report and discussed it with your client?

8           MR. RUBIN:  I have, your Honor.

9           THE COURT:  And, Mr. McCrimon, have you read the

10  presentence report, or has someone helped you review the

11  presentence report?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And have you discussed it with your

14  attorney; Mr. Rubin?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  And, Mr. McMahon, have you read the

17  presentence report?

18          MR. McMAHON:  I have, your Honor.

19          THE COURT:  All right.  Just have a seat for a moment,

20  Mr. Rubin.  I just want to sort of summarize what's in the

21  report for the record.

22          This is the calculation of the sentencing guidelines

23  range as set forth in the presentence report.  It starts with a

24  base offense level of 20 under Guidelines Section 2B3.1.  Two

25  levels are added because the property of a financial

1  institution was taken.  That's 2B3.1(b)(1).  Three levels are

2  added because the defendant created the impression that he

3  possessed an explosive device.  The reference for that is

4  2B3.1(b)(2)(E), and Application Note 2 to that section.  An

5  additional point is added because the loss exceeded $10,000.

6  Two additional levels are added because the defendant --

7  basically, for obstruction of justice, but specifically because

8  the defendant recklessly created a substantial risk of death or

9  serious bodily injury to others in the course of fleeing from

10 the scene of the crime.  That's under 3C1.2, and the relevant

11 conduct rules of 1B1.3(a)(1)(B).  There is a three-level

12 downward adjustment for acceptance of responsibility.  The

13 report says that the defendant has three criminal history

14 points for a conviction in 1995, which yields a Criminal

15 History Category of II.

16        So the sentencing range, according to the PSR, at

17 Level 25, Criminal History Category II, is 63 to 78 months'

18 imprisonment.  The supervised release range is one to three

19 years.  The fine range is $10,000 to a thousand dollars.

20        What I've done is just summarize what's in the report.

21        Now, I know there are a number of issues that I need

22 to resolve.

23        Number one, the -- well, the first issue is the loss

24 issue.  And my understanding is that there was some suggestion

25 of the defendant challenging the one-level upward adjustment

1    for loss of $15,000, because that loss is based on the $10,000

2    loss associated with the Ardsley bank robbery, which is the

3    bank robbery to which the defendant pleaded guilty.  And then,

4    in Paragraphs 15 and 16 of the PSR, there is a reference to a

5    separate robbery of the Hudson Valley Bank, in Mount Vernon,

6    which I think occurred a couple of weeks prior to the Ardsley

7    robbery.  And again, the Ardsley robbery is the robbery to

8    which Mr. McCrimon pleaded guilty.  And in the plea agreement,

9    it says that the loss is $15,000, referencing those two

10   robberies.  But, of course, the defendant has not been

11   convicted of the -- or even charged, for that matter, with the

12   Mount Vernon robbery.

13             Now, again, so we're clear on this, I got a letter

14   from the government dated --

15             Your most recent letter is here somewhere.  Just give

16   me one second.

17             (Pause)

18             THE COURT:  Here it is, your May 12th, letter,

19   Mr. McMahon, where you discuss the circumstances or the

20   government's assertions, anyway, regarding this Mount Vernon

21   robbery.  But then you say that "The parties have agreed that

22   we do not need a Fatico hearing regarding the one-point

23   enhancement for the Mount Vernon robbery.  Accordingly, the

24   government will rest on the facts and argument in its

25   April 16th memorandum" -- and that was actually before your

1  previous memorandum -- "and this letter, and will not be

2  presenting any testimony at tomorrow's sentencing."

3         In addition, in Mr. Rubin's submission of May 9th, he

4  said, "We are not herein challenging the one-point increase for

5  the loss amount," and then goes on to say that "If the Court is

6  going to give any consideration to the government's assertion,"

7  meaning the robbery -- the assertion that Mr. McCrimon was

8  involved in the Mount Vernon robbery," the letter goes on to

9  say, quote, "I am" -- meaning Mr. Rubin -- "I am requesting the

10  opportunity to respond, as I do not believe that any credible

11  evidence supports the conclusion that the defendant

12  participated in that robbery."

13         So let me deal with that issue first.

14         Well, you know what?  Let me list the other two issues

15  and ask you if there are any other objections beyond these

16  three things or any other issues beyond these three things.

17         The other issue is the plus three levels for use of a

18  dangerous weapon -- that's referred to in the report at

19  Paragraph 26 -- and the plus two levels for obstruction, based

20  on the flight after the bank robbery.  That's referenced in

21  Paragraph 30.

22         Those are the three issues that I think I need to

23  resolve one way or another.

24         Other than those issues, are there any other factual

25  or other objections of any kind that the defendant has to the

145EMCCmsS                    Sentence

1  PSR?

2          MR. RUBIN:  No, your Honor.

3          THE COURT:  Okay.  And what about the government?  Are

4  there any other disputes or objections you have to the PSR,

5  either factually or legally?

6          MR. McMAHON:  No, your Honor.

7          THE COURT:  Other than the three we just talked about.

8          MR. McMAHON:  Other than these three.

9          THE COURT:  Okay.  All right.  Well, then, other than

10  the factual recitation regarding loss, dangerous weapon and

11  obstruction, there is no dispute as to the facts, and so the

12  Court adopts the factual statements in the presentence report

13  as the Court's own findings of fact for purposes of sentencing,

14  with the exception of those three matters.

15          MR. RUBIN:  Judge --

16          THE COURT:  But I am going to make some additional

17  rulings regarding those three matters.

18          Go ahead.

19          MR. RUBIN:  Judge, I apologize.

20          My client brought to my attention, and I don't -- it

21  doesn't affect his criminal history.  However, there is a

22  statement in the presentence report in the criminal history --

23          THE COURT:  Give me a page or a paragraph.

24          MR. RUBIN:  I'm about to look for it, Judge.  I

25  apologize.

145EMCCmsS                    Sentence

1          THE COURT:   The criminal history is on Page 9, if that

2    helps.

3          MR. RUBIN:   I see that.   It may be -- let me see.   It

4    refers to another -- there is some place -- and I apologize I

5    don't have it handy -- where they refer to a subsequent -- I

6    don't think they call it an "arrest," but a subsequent

7    allegation that he was involved in some type of criminal

8    behavior, but there was no -- there is nothing on his record

9    regarding that.   So he didn't receive any points for it.   I'm

10   just trying to locate it.

11         THE COURT:   I think I know what you're referring to.

12   Paragraph 41.

13         MR. RUBIN:   Okay.

14         THE COURT:   You're talking about -- it, not you.   The

15   PSR talks about adjustment to parole supervision following the

16   1995 conviction?

17         MR. RUBIN:   Right.

18         THE COURT:   And it says, "On November 23rd, 2002,

19   Mr. McCrimon was arrested for criminal mischief and assault."

20         Is that what you're talking about?

21         MR. RUBIN:   It is, Judge.

22         THE COURT:   There is no reference to that arrest in

23   the presentence report.

24         MR. RUBIN:   There isn't.   And I'm told that there was

25   some altercation -- it didn't result in an arrest -- between my

1   client and the mother of one of his children. That's what

2   they're probably referring to, but there was never any type of

3   arrest or any type of adjudication regarding that.

4         THE COURT: Well, I'm sure there was no adjudication,

5   but the narrower question is: Was there an arrest? And that

6   would be reflected in his rap sheet.

7         I mean, you have his rap sheet, Mr. McMahon. Or both

8   of you do, I assume. I'm prepared to ignore it.

9         Go ahead.

10        MR. RUBIN: If you are going to ignore any reference

11   to that, then I have no other objection.

12        THE COURT: I mean, your impression is that he was

13   never arrested.

14        MR. RUBIN: No, I'm sorry, Judge. Actually, I

15   misspoke. He was arrested. Apparently, he was arrested, but

16   the charges were thrown out or dismissed.

17        THE COURT: Okay. Well, there is certainly nothing in

18   the PSR that says that he was convicted of anything with

19   respect to that incident; the '02 incident, that is. So as far

20   as I'm concerned, it plays absolutely no role whatsoever.

21        MR. RUBIN: Then I have nothing else.

22        MR. McMAHON: Well, the only thing I would point out,

23   Judge, is that the incident, not the arrest, but the incident

24   is relevant, because it led to his parole being revoked, and he

25   was held to the end of his parole.

1          THE COURT:  That's incorporated into the Criminal

2     History Category, as far as I'm concerned.  The Criminal

3     History Category reflects three points.  The reason it reflects

4     the three points, I think, is because, even though the

5     conviction was 18 years prior to the bank robbery in this case,

6     he was in custody within ten years of the bank robbery.  So

7     therefore, that counts, I think.

8          MR. McMAHON:  Right.

9          THE COURT:  The point is, the fact that he was in

10    custody for a parole violation is accounted for in his Criminal

11    History Category already.  So we don't have to get into an

12    underlying arrest or underlying conduct that led to a parole

13    violation.  So that's neither here nor there.  The point is, he

14    gets three criminal history points, and therefore, he's

15    Category II.  And we agree on that.  Right?

16          MR. RUBIN:  Yes, Judge.

17          MR. McMAHON:  Yes, your Honor.

18          THE COURT:  All right.  So I'm not going to

19    consider -- and, in fact, until you just mentioned it,

20    Mr. Rubin, I read it, but I had forgotten it was in here, and

21    it plays no role in my decision here.

22          Let me deal with these issues.

23          First of all, as to the "dangerous weapon"

24    enhancement, which is the two-level upward adjustment under

25    2B3.1(b)(2)(1) -- (b)(2)(E).

1  ||      I'm sorry, Mary.  It's 2B3.1(b)(2)(E).

2  ||      The Court finds that that enhancement does apply in

3  || this case.  Specifically, the defendant used an object, his

4  || camera bag, and also the note that he used when he went into

5  || the bank, in a manner that created the impression that the

6  || object, meaning the camera bag, was an instrument capable of

7  || inflicting death or serious bodily injury.

8  ||      It's clear under the guidelines that the object does

9  || not have to, in fact, be a dangerous weapon.  It just has to be

10 || used in a manner that creates an impression that it is an

11 || instrument capable of inflicting death or serious bodily

12 || injury.  So in this case -- and there is no dispute about these

13 || facts.  In this case, the defendant was wearing a bag around

14 || his neck that resembled a camera bag.  And he handed the teller

15 || a note that said, quote, "You got 15 seconds to give me 20,000

16 || or this device is going off."

17 ||      As explained in Application Note 2 to this section of

18 || the guidelines, 2B3.1, such an object shall be considered a

19 || dangerous weapon for purposes of Subsection (b)(2)(E) of 2B3.1

20 || because it clearly is an object that -- when I say "object,"

21 || it's a combination of the note and the bag -- created the

22 || impression that he was carrying something that was capable of

23 || inflicting death or serious bodily injury, even though he

24 || wasn't carrying any such thing.  But that's not the point.  The

25 || point is that he created the impression that he was.

1          And obviously, the reason for that enhancement is that

2    the mere creating of the impression gives rise to a danger.  It

3    would be even more dangerous if he was actually carrying an

4    explosive device.  That would be even more dangerous.  But if

5    you're giving the impression, creating the impression, that

6    you're carrying an explosive device, there is a real danger

7    associated with that, as well, because you could have

8    intervention by a guard or by a police officer or by a

9    bystander.  You could have some kind of physical altercation.

10   You could have gunshots fired.  There's all sorts of horribles

11   that could ensue from that.  It didn't happen here, but that's

12   not the point of the guideline.  The guideline is designed to

13   punish someone more severely who creates the impression that he

14   is carrying an instrument capable of inflicting death or

15   serious bodily injury.

16          So that I think that that enhancement clearly applies.

17   I really don't think it's a close case on that one.

18          The second question is whether the two-level

19   enhancement under Section 3C1.2 applies, namely, creating a

20   substantial risk of death or serious bodily injury to another

21   person in the course of fleeing from a law enforcement officer.

22   And that is contained, as I said earlier, the "obstruction of

23   justice" enhancement, in 3C1. -- I apologize.  It's not the

24   "obstruction of justice" enhancement.  It's the "reckless

25   endangerment during flight" enhancement, which is 3C1.2.  And

1    in that case -- the reason why the defendant is opposing that

2    is because he was not driving the car that was driven by his

3    co-defendant, Mr. Sherrod, at high rates of speed through the

4    streets of lower Westchester in the middle of the day.

5            Again, I don't think this is in dispute at all.

6    Factually, what happened here is that after Mr. McCrimon came

7    out of the bank and got into the get-away car being driven by

8    the co-defendant, the car drove away from the scene.  An

9    Ardsley police officer pulled the car over because he saw

10   someone inside the car changing his clothes, and he thought

11   that was odd.  The car did pull over, at least hesitate, but

12   very shortly after that, the car took off at a high rate of

13   speed, and a chase ensued.  The police officer chased the car.

14   The car drove through the busy streets in the middle of day, at

15   speeds up to a hundred miles an hour.  It hit at least one

16   other car.  At one point, it drove in the opposite lane of

17   traffic.  Eventually, it crashed in Hastings, and the car was

18   damaged.

19           There was a passenger in the car, other than the

20   defendant and his co-defendant.  She was endangered by this

21   behavior, greatly endangered by this behavior, as were other

22   drivers, pedestrians and the Ardsley police officer who pulled

23   the car over in the first place.  All of those people were put

24   at serous risk of -- or put at risk of serious physical injury,

25   and that seems obvious.

1      The not-so-obvious question is whether Mr. McCrimon

2   should be held accountable for this reckless flight from the

3   police, even if he didn't drive the car himself or even if he

4   didn't aid and abet, share in its reckless driving.

5      I know the government said a lot about what Sherrod

6   says that McCrimon said and McCrimon said to Sherrod while they

7   were in the car.  And I kind of agree with Mr. Rubin, at least

8   to this extent, that it's an usual circumstance where the

9   government is saying that someone is credible because he

10   changed his story four times.  That's one I haven't heard

11   before.

12      But as a legal matter under the guidelines, number

13   one, the effort to flee the police was clearly in furtherance

14   of criminal activity.  In other words, flight from the robbery

15   itself to avoid arrest is in furtherance of the underlying

16   criminal activity.  So that certainly applies here.

17      And then the question is:  Was it reasonably

18   foreseeable to Mr. McCrimon that this would happen?  And my

19   conclusion, my finding, is that it is -- that it was reasonably

20   foreseeable to Mr. McCrimon that this would happen, simply

21   because flight from a bank robbery in a get-away car being

22   driven by a co-conspirator might well involve reckless driving

23   that would endanger others.

24      So it's not just the fact that there is going to be an

25   effort to flee, but it's reasonably foreseeable that in the

1   course of that effort to flee in a get-away car that the car

2   might be driven at a high rate of speed, that police might try

3   to pull the car over, that police might chase the car, that in

4   the course of driving at a high right of speed in order to flee

5   or evade arrest that other people would be endangered,

6   especially in a populated area such as Ardsley and Hastings,

7   New York, and especially since there was another person in the

8   car.  It's not like Mr. McCrimon was the only other passenger.

9   There was a second passenger.

10        So A, fleeing from the police was clearly in

11  furtherance of the underlying criminal activity, and B, it was

12  reasonably foreseeable to Mr. McCrimon that this would happen,

13  because flight from a bank robbery in a get-away car driven by

14  a co-conspirator might well, and is therefore reasonably

15  foreseeable to, involve reckless driving that would endanger

16  others, especially in this area, especially when there was a

17  third person in the car.  And this is true, even if I disregard

18  what Sherrod told the police in a postarrest statement, or the

19  various -- some of the inconsistent things that Sherrod told

20  the police in his postarrest statement.

21        Sherrod allegedly told McCrimon that -- told the

22  police that McCrimon told Sherrod not to stop.  And after

23  Sherrod took off with the cops in pursuit, McCrimon said -- or

24  kept telling Sherrod to go.  That's according to Sherrod, now.

25  There has been no -- Sherrod hadn't testified.  I don't have an

1    affidavit from him.

2           You know, there is some corroboration, I guess, for

3    Sherrod's postarrest statement, because part of his postarrest

4    statement was that he stopped his car, and then sped off.  And

5    the police officer also said that the car stopped and then sped

6    off.  So in that limited respect, there is some corroboration.

7    But there is really no corroboration for the rest of it,

8    namely, that McCrimon told him not to stop, or after Sherrod

9    was driving with the police in pursuit, that McCrimon kept

10   telling Sherrod to go.

11          But I don't think those things are necessary to my

12   finding.  In other words, even if Mr. McCrimon did not aid and

13   abet -- I think that's what Mr. Rubin is arguing in his

14   letter -- in other words, even he didn't press on the gas or

15   even if he didn't tell Sherrod how fast to go or even if he

16   told Sherrod to stop -- if he had said to Sherrod, "Look.

17   You're endangering the passenger.  You're endangering me.

18   You're endangering other people.  You're endangering the

19   police," you know, I don't think any of that matters.  The

20   bottom line is, the flight itself was in furtherance of the

21   crime, meaning the bank robbery.

22          And secondly, it was reasonably foreseeable to this

23   defendant that this flight at an excessive rate of speed

24   involving reckless driving would occur, because it involves

25   trying to avoid arrest.  And sometimes when people do that,

1  they do things that they might not otherwise do.  They might

2  not drive a hundred miles an hour on the wrong side of the

3  street, but for the fact that they don't want to go to jail.

4  And Mr. McCrimon had been in the bank robbery.  It would be

5  different if he wasn't involved in the bank robbery, but he

6  was, and he knew that Sherrod was driving.

7          And for all those reasons, it seems to me, it was

8  entirely reasonably foreseeable that what did happen would

9  happen.  And therefore, Mr. McCrimon is accountable for the

10 two-level upward adjustment under Section 3C1.2.  And the

11 "reasonable foreseeability" issue, that comes out of the

12 relevant conduct rules in the guidelines.  So the bottom line

13 is that he is accountable for that conduct.

14         Now, as to whether there should be a one-level upward

15 adjustment based on the $15,000 loss, this is simple.  The fact

16 is that the defendant stipulated to the $15,000 total-loss

17 figure.  So there is no question that the one-level upward

18 adjustment does apply here.

19         And it wasn't an agreement without consideration,

20 because the plea agreement also says that in return for

21 pleading guilty to this offense, the government -- the

22 defendant would not be prosecuted for, among other things, this

23 second bank robbery, the Mount Vernon bank robbery.  The point

24 is, this was an agreement that was entered into with good

25 counsel on both sides, and there is absolutely no reason to

1    ignore the agreement that they made as part of the "plea

2    bargaining" process.

3              Now, having said that, in deciding what sentence to

4    actually impose in this case, I am not going to give any

5    consideration to the government's assertion that McCrimon

6    participated in the Hudson Valley bank robbery, in Mount

7    Vernon, on March 13th, 2013.  The only thing that I am

8    sentencing the defendant for, in terms of deciding what

9    sentence is sufficient, but not greater than necessary, to

10   comply with the sentencing purposes of Section 3553(a), is the

11   Ardsley bank robbery of Wells Fargo Bank, which is the only

12   bank robbery charged in Count Two, and is the only bank robbery

13   to which he's pleaded guilty.

14             All right.  Are there any other factual or legal

15   issues relating to the calculation of the guidelines that I

16   need to resolve before I finally put on the record my

17   calculation of the guideline range?

18             MR. McMAHON:  Not from the government, your Honor.

19             MR. RUBIN:  No, your Honor.

20             THE COURT:  All right.  Based on the parties'

21   agreement on certain aspects of the guidelines, not all of

22   them, obviously -- but they did agree to some extent on what

23   the guidelines -- the applicable guidelines range is.  So based

24   on that agreement, based on my review of the presentence

25   report, and, more importantly, based on my own evaluation of

1    the sentencing guidelines, I adopt the guidelines calculation

2    in the PSR, and conclude that the final offense level is 25,

3    Criminal History Category II, which yields a sentencing range

4    of 63 to 78 months' imprisonment.

5            There has been no motion for any guidelines-based

6    departure from the applicable range.

7            Does the government wish to be heard on sentencing?

8            MR. McMAHON:  Your Honor, as your Honor has already

9    noted, I submitted a sentencing letter on April 14th, 2014.  I

10   know the Court has read it, and I will rest on that.  Unless

11   the Court has any questions or any issues that it wants me to

12   address, I'll just rest on my letter.

13           THE COURT:  Well, I appreciate that you're resting on

14   it, but I have to say, as I said earlier, I don't think it

15   matters, and I've made a finding that it doesn't matter, what

16   Mr. Sherrod says Mr. McCrimon did.  But it is unusual in my

17   experience -- and to this extent, I certainly agree with

18   Mr. Rubin -- to have the government, at least to some extent,

19   argue in favor of someone's -- some co-conspirator's

20   credibility based on changing his story.  That's unusual.

21           MR. McMAHON:  Well, under the circumstances here --

22   and I won't take a lot of time on it, your Honor, but I think

23   it actually is indicative of the fact that the final statement

24   that Sherrod made was truthful and he was being candid at the

25   end, simply because the statement he made was against his penal

145EMCCmsS                    Sentence

1    interest.  And the fact that he moved back the time when he

2    learned that McCrimon planned to rob the bank that day -- and

3    he moved it back four times -- shows that he slowly and

4    grudgingly came to that final admission.

5              THE COURT:  But it was more of a, you know, indictment

6    of McCrimon than it was an admission of his own, wasn't it?

7              MR. McMAHON:  No, it was -- no.

8              THE COURT:  Wasn't it mainly exaggerating or mainly --

9    not exaggerating, but mainly talking about McCrimon's

10   involvement?

11             MR. McMAHON:  No.  No, your Honor.

12             It was Sherrod saying -- Sherrod initially said, "I

13   didn't know McCrimon planned to rob a bank that day until he

14   came back to the car with cash in his hands, and then I

15   realized he robbed the bank."  Then as he was being questioned

16   by the agent, he slowly walked it back, until finally, in the

17   fourth version, he said, "All right.  I knew before we left New

18   York City that day that he and I together were going to rob a

19   bank."  And that makes him far more culpable, obviously.  In

20   the first version, he's not culpable.

21             THE COURT:  Right.  But what does that have to do with

22   the things that McCrimon supposedly said in the car while they

23   were being chased by the police?

24             MR. McMAHON:  It just -- it shows that Sherrod

25   ultimately was being truthful in his postarrest statement,

1    because he came to understand that perhaps it was in his best

2    interest to be truthful.

3            And the statements he understood also were against his

4    penal interest, which is, you know, one indicia of reliability,

5    for example, under the Federal Rules of Evidence, and I think

6    it's an accurate indicia of reliability.  So that was my point.

7            THE COURT:  Yes, I understand that point.  But the

8    problem is that there's all sorts of arguments that could be

9    made the other way, which is that, yes, he eventually pointed

10   the finger at himself, but he also pointed the finger, in a

11   very accusatory way, at his co-defendant.

12           You know, he was arrested immediately after this

13   incident.  Correct?

14           MR. McMAHON:  Yes.

15           THE COURT:  So that the thing that had just happened

16   was that there was this death-defying chase through the streets

17   of Ardsley and Hastings, which I think, in Mr. Sherrod's mind,

18   since he was the driver of the car, was the more -- was the

19   thing that was mostly on his mind.  I mean, okay.  He had

20   committed a bank robbery.  But the main thing that he had done,

21   in terms of causing possible mayhem -- and actually, it's kind

22   of amazing that nobody got hurt in all this.

23           I remember a case that I worked on years ago, a bank

24   robbery case, flight from police, and somebody was killed in

25   the course of that flight from the police.  And that, I would

1    think, would be a more typical outcome than what happened here.

2           But my point is, he had just gone through this

3    death-defying experience.  So what was on his mind was the

4    dangerousness and the outrageousness of that behavior, probably

5    more so than the rather, you know, neutral event of just going

6    in and robbing a bank of $10,000, at least in his own mind.  So

7    what he was really trying -- he wasn't really focusing so much

8    on the bank robbery.  He was mainly focusing on trying to shift

9    responsibility for the offense of -- at least minimize his own

10   responsibility for the car chase.  That was playing a large

11   role in what he was saying to the police.

12          Look.  Here's the thing.  I don't think it matters.  I

13   don't think it matters what McCrimon said or did not say in the

14   car.  If he didn't say one word, he's still responsible for

15   that upward adjustment based on the flight.

16          MR. McMAHON:  All right.  And that was my first

17   argument in my letter.  But then this argument was a secondary

18   argument.  And he was corroborated, also, by the fact that

19   Sherrod stopped and then took off.

20          When you consider all those factors together, I think

21   it shows that Sherrod actually was being truthful at the end of

22   the day.

23          THE COURT:  Well, I'm not going to make a finding one

24   way or the other about that.  What I'm making my finding about

25   is that Mr. McCrimon is responsible for that flight -- for that

1   reckless endangerment during flight.  He is responsible for

2   that.

3            Okay.  Anything else that you'd like to say?

4            MR. McMAHON:  Nothing, your Honor.

5            Thank you.

6            THE COURT:  All right.  Mr. Rubin, do you wish to be

7   heard on sentencing?

8            MR. RUBIN:  Judge, you indicated that you are not

9   considering the Mount Vernon bank robbery.

10           THE COURT:  I'm not.  As far as I'm concerned, that's

11  a nonevent.

12           MR. RUBIN:  All right.  Because my concern was that

13  even though in the letter of yesterday -- that's all the letter

14  was about.

15           THE COURT:  I just told you I'm not considering it.

16  I'm going to sentence Mr. McCrimon for a pretty serious crime

17  that he's been convicted of, which is the Ardsley bank robbery.

18           MR. RUBIN:  Solely.

19           THE COURT:  Period.

20           MR. RUBIN:  The Court has found the guidelines -- the

21  guideline calculation in the presentence report to be the

22  appropriate guideline level.  But I would ask the Court to

23  consider a nonguideline sentence in this case.

24           Mr. McCrimon suffers from -- without going into

25  detail, it's in the record and it's in my presentence

1    memorandum.  But there are definitely cognitive issues, as well

2    as the fact that he was drunk at the time of this particular

3    incident.  Although the government seems to want to give

4    Sherrod some type of great credibility, I think the Court

5    pointed out that it's not -- I don't think it's consistent with

6    what they would be arguing if I was standing here next to

7    Sherrod.

8         THE COURT:  It's a mixed bag.  You know, some of it

9    may be true.  And he does point the finger more at himself as

10   time goes on, but he also points the finger more at McCrimon.

11        MR. RUBIN:  At all times --

12        THE COURT:  Nobody, nobody, not just people who've

13   just committed serious crimes, but I mean, nobody is all

14   truthful or all untruthful.  It's almost always a mix.

15   Hopefully, those of us who are ethical and decedent people try

16   to get, you know, the highest possible degree of truthfulness.

17   But you know, human beings are funny in that way.  They're not

18   all one way or all the other way.  So I think there is a

19   complicated balance.

20        MR. RUBIN:  And there are certain things he couldn't

21   deny, such as he was driving car, such as there was a bank

22   robbery.  We stopped at the fourth version.  If there was a

23   fifth version, it may have been, "I told him to go into the

24   bank."  So we don't know where it would have ended.  We don't

25   know how much is truthful and how much isn't.

1       But we can make a determination as to what is more

2    probable than not, based upon the facts that we do know.  And

3    what we do know is that my client is extremely handicapped, in

4    the sense of certain intellectual capabilities.  And it would

5    be very hard to believe that my client had directed the show

6    here.  And particularly, Sherrod has got a couple of felony

7    convictions for drug dealing, certain other things.  That would

8    indicate that he had some degree of street smarts.

9       THE COURT:  Although I remember from Mr. Sherrod's

10   case -- I don't remember all the details -- that he also had a

11   legitimate job, it seemed to me.  I mean, the whole thing about

12   that was kind of strange.  Here's a guy with a real job;

13   actually, full-time employment --

14       MR. RUBIN:  It may be --

15       THE COURT:  -- and then engaged in this behavior.  I

16   mean, it's mixed.  It's mixed.

17       MR. RUBIN:  I'm talking about his cognitive ability.

18       THE COURT:  Oh, okay.  In a relative sense, he had a

19   greater intellectual capacity than did Mr. McCrimon.

20       MR. RUBIN:  And to make it sound like somehow this

21   entire incident between the bank robbery and the escape or the

22   flight from the bank robbery was somehow all my client's doing,

23   even though he moderated a little bit as the -- I don't think

24   the FBI expressed skepticism, because the story kept on

25   changing.

1    You've got the letters from the various people who

2    know my client.  He certainly engaged in this robbery.  As a

3    matter of fact, his story immediately, when he was caught, was,

4    "I did it."  He never tried to say that he didn't do it.  He

5    never tried to make up other stories.  He admitted his

6    culpability immediately upon being caught.  I don't know even

7    if he was questioned.  I think he just perhaps blurted it out

8    to the police.

9    However, I think the Court should take into

10   consideration -- while the Court has found that the guidelines

11   do apply -- that the enhancements to the guideline calculations

12   do apply to my client for possessing what it would appear to be

13   a dangerous device, as well as the reckless endangerment caused

14   by the flight, I think that the Court should take into

15   consideration that, in fact, there was no weapon.

16   Now, while the guideline calculation, I understand, is

17   as the Court has determined, he, in fact, had no weapon.  And

18   if anybody was likely to be injured should a bank guard or

19   police officer, you know, draw a gun thinking that he had a

20   weapon, it was likely to be him.  I think it's something the

21   Court can and perhaps should consider in determining whether or

22   not a nonguideline sentence is appropriate, the fact that he

23   was not armed.

24   Secondly, I think that the fact is that my client did

25   not have control of the vehicle.  Now, while it might be

1   reasonable for a reasonable person to expect that his

2   co-conspirator is going to engage in reckless conduct -- and

3   the Court has just found it, and I'm not sure I agree a hundred

4   percent, but flight is flight -- my client wasn't operating the

5   vehicle.  Sherrod was.

6           THE COURT:  What you're saying -- without conceding

7   the point, I think what you're saying is that even if he is

8   accountable for the guidelines --

9           MR. RUBIN:  Right.

10          THE COURT:  -- adjustment, still, as a matter of

11  common sense and fairness, he's not as --

12          MR. RUBIN:  Culpable.

13          THE COURT:  -- culpable as Sherrod, because he wasn't

14  driving the car.

15          MR. RUBIN:  Correct.

16          And I think the fact that Sherrod might have stopped

17  for a second and then sped up is no indication that my client

18  told him to do that.  People, when they -- I mean, I don't know

19  how many times I've seen cases --

20          THE COURT:  I'm not finding in any way, shape or form

21  that Mr. McCrimon told him to do that or told him to go or told

22  him to stop or told him to speed.  That has no place in this

23  sentencing at all.

24          MR. RUBIN:  Beyond that, I might have written in my

25  letter, the government --

1    THE COURT:  Might have written?  Don't you know what

2  you wrote?

3    MR. RUBIN:  I don't recall if I wrote this or not.

4  And if I look at it carefully, I might find it.  But what I

5  want to point out -- and I may have pointed it out already --

6  is that the government's response to Sherrod's presentence memo

7  argues that Mr. McCrimon -- the reason why Sherrod should be

8  held accountable for the "reckless endangerment" enhancement is

9  because, among other people, Mr. McCrimon was endangered by

10  Sherrod's driving, and which I'm arguing here, as well, you

11  know.

12    So in terms of relative culpability for that behavior,

13  I'm arguing that my client did not want Sherrod to cause him to

14  become injured, did not want him to drive like a maniac through

15  the streets, and was not -- was not urging him to do so.

16    In the theoretical sense, was it reasonably

17  foreseeable?  The Court has already found that it is.  But I

18  think that that should also be taken into consideration by your

19  Honor when determining whether or not my client is a person who

20  is perhaps worthy of a less-than-guideline sentence.

21    The Court has sealed the documents, with my approval,

22  and I'm glad you've done so.  But the documents and everything

23  that's been provided to the Court would indicate that he is of

24  limited intellectual ability, that he is also a very loving

25  individual to those people close to him, including children.

1    His sister is here in court today, as is his -- well, the

2    person he lives with, who is the mother of his child, Rasheeda

3    Barzey.  And they've both written letters.  Of course, you've

4    read their letters.  All the letters, all the letters that the

5    Court has received, all kind of describe my client the same

6    way.  Besides the cognitive difficulties that he has, he also

7    has certain psychological problems for which he's receiving

8    medication, which, by the way, in my assessment, has been doing

9    a great deal of good for him, because over the course of time,

10   I find he has become somewhat more communicative with me,

11   including today when I spoke to him earlier today.

12        Obviously, he's anxious to get back to his family, to

13   the child that he adores and has been -- by all reports, cares

14   for the child well.  And you know, I recognize that -- you

15   know, I'm not standing here asking for a "time served"

16   sentence, but I think that a sentence -- he recognizes the --

17        Well, I think all of the requirements of 3553 can be

18   met with a sentence that's less than the guideline level, which

19   is in excess of five years.  That would be sufficient, but not

20   greater than necessary, to take into account all the

21   requirements of the statute.

22        He doesn't want to be in this situation again.  He has

23   had a miserable time in jail for a number of reasons, one of

24   which is, he's aware of his limitations.  And it's something

25   that, to a great extent, embarrasses him.  And he has not been

1    using that as an excuse, even in jail.  He doesn't want to try

2    to use those things as an excuse to get better housing, for

3    example, in the jail.  So it's a difficult time for him.

4         You know, I know you know all the arguments.  You've

5    been in this situation where I am before.

6         I think that there can be a sentence fashioned that

7    would include some period of incarceration, followed by,

8    hopefully, some structured and significant period of therapy,

9    whether inpatient or outpatient, something to be determined by

10   the professionals, but something that could help him, both

11   emotionally and -- well, help him psychologically, I expect,

12   get on with his life, because he will get out of jail at some

13   point in the future.  And we would want him to get out of jail

14   a better person than the way he went in.  And unfortunately, my

15   experience with the Bureau of Prisons is that he's not going to

16   get a great deal of therapy while he's in prison.

17        In fact, I recently had a case with Judge McMahon

18   where I had a client who was sentenced for a -- on a "child

19   pornography" case.  And Judge McMahon gave a sentence, and made

20   a strong, strong recommendation that he be sent to a facility

21   where he would receive the appropriate counseling therapy,

22   whatever you want to call it, for the offense that he had

23   committed.  Not only wasn't he sent to a facility, he never

24   received any counseling in the entire -- he had a four-year

25   sentence, you know, served whatever period of time with the

1    good time.  But he never received a minute of therapy or

2    counseling.

3            So I'm not -- you know, I am not terribly confident

4    that the Bureau of Prisons is going to address any type of

5    either emotional or psychological rehabilitation or therapy

6    that he would require.  And that's why I'm asking -- you know,

7    I understand punishment has to be part of this.  But I don't

8    think that 5 years is necessarily the amount, or 63 months, or

9    63 to 71 months is necessarily the amount of punishment that

10   would be sufficient, but not more than necessary, to do this.

11   I think that some period of punishment, obviously, is called

12   for, but I think, more importantly, there should be a period

13   when -- there should be some type of significant "supervised

14   release" structure to enable him to get out a better person.

15   Because, God willing, he's going to get out.  And if he just

16   does the five years with nothing and he gets out, you know, is

17   he going to be a better person for it?  I doubt it.

18           And that's all I have to say, Judge.  I believe he is

19   a good candidate for a less-than-guideline sentence, for the

20   reasons that I've said and reasons that you're aware of from

21   the submission.

22           THE COURT:  Okay.  Thank you, Mr. Rubin.

23           Mr. McCrimon, is there anything that you would like to

24   say, or is there any information that you would like to present

25   before I impose sentence?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Okay.  Why don't you sit down.  That way,

3    you can be heard better through the microphone.  Pull that

4    microphone up towards you.

5          Go ahead, Mr. McCrimon.

6          MR. RUBIN:  May I just ask him briefly what he --

7          THE COURT:  Of course, you can talk to him.  Take your

8    time.

9          (Conference between defendant and attorney)

10          THE COURT:  Go ahead, Mr. McCrimon.

11          THE DEFENDANT:  Sir, I just want to say that I know

12    what I did was wrong, and I'm sorry to the people in the bank

13    that I scared.  I didn't mean to hurt anybody.  And, you know,

14    I'm sorry to my family, and I didn't mean to hurt them.  I ask

15    that everybody please forgive me.  And I got one son, and he's

16    18, and I want to help him so he won't be in a situation like

17    me.  I ask that I be given a chance.  I'm sorry.

18          THE COURT:  Anything else, Mr. McCrimon, or is that

19    it?

20          THE DEFENDANT:  That's it.

21          THE COURT:  Okay.  Thank you very much.

22          All right.  Well, let me say first that in deciding

23    the appropriate sentence in this case, I have considered all of

24    the statutory factors set forth in Section 3553(a) of Title 18.

25    And for reasons that I'll spell out in a moment, I do not think

1    a nonguideline sentence in this case is appropriate.  I believe

2    a sentence of 63 months' imprisonment, to be followed by three

3    years of supervised release, is sufficient, but not greater

4    than necessary, to comply with the purposes of sentencing set

5    forth in the statute.

6            I am perfectly willing, in the appropriate case -- in

7    fact, in most cases, I would say -- to impose a sentence that

8    varies from the guidelines, if there is a good reason to do so.

9    The "if," of course, is the big question.  I'm not going to do

10   it just as a matter of routine.  I would do it, and I have done

11   it many times, if I thought that there was a good reason to do

12   so.

13           But what we have here is a bank robbery in broad

14   daylight in our community, where Mr. McCrimon, even if he is of

15   limited intellectual capacity, was wearing a bag of some kind

16   around his neck, presented a note to the teller which was

17   clearly threatening.  It didn't say "I'm going to shoot you

18   immediately if you don't give me the money," but the gist of

19   the note was, "Something really bad is going to happen if you

20   don't give me $20,000 quickly."  And that's where we start and

21   almost end in this case, because that's a serious crime.

22           And I just don't see how I can impose a sentence less

23   than 63 months, which is the bottom of the guideline range, for

24   a crime as serious as this.  It doesn't matter that it wasn't a

25   real explosive device.  It doesn't matter whose idea it was.

1    Maybe it was Mr. Sherrod's idea to rob this bank.  I don't

2    know.  But to me, it doesn't matter.  What matters is that

3    Mr. McCrimon knew what he was doing when he went into that bank

4    with a prop and with a note.  And as I said earlier, the risk

5    in that circumstance is real, even if the device is not real;

6    in other words, even if there is no weapon.  That's a good

7    thing.  I guess it would be worse -- it would be worse if it

8    was a real weapon.  In fact, it would be an "armed bank

9    robbery" charge.  This is not an "armed bank robbery" charge.

10   Right?  This is just a straight bank robbery.

11              Am I right about that?

12              MR. McMAHON:  Yes, your Honor.

13              THE COURT:  It doesn't require -- there is no element

14   of the use of a weapon to rob the bank.

15              MR. McMAHON:  No.

16              THE COURT:  So armed bank robbery is, by definition,

17   more serious than bank robbery.  In this case, he was not

18   armed, but what he did did create a real risk of harm to other

19   people in the bank, because there easily could have been a

20   violent reaction by police or bystanders or someone in the

21   bank.  And really terrible things can happen when there is a

22   violent reaction to someone who is threatening the use of a

23   destructive device.

24              In addition, as we said before, fleeing from police is

25   part and parcel of robbing a bank.  I mean, it's in the public

1    imagination that there is always a get-away driver from a bank

2    robbery.  And you always hop in and speed off and try to avoid

3    arrest and capture.  And that also creates great danger to

4    bystanders, pedestrians, other drivers, the other person in the

5    car, even the police.  It puts everybody in extreme risk of

6    serious injury.

7            Now, I do agree with Mr. Rubin that in a relative

8    sense, Sherrod, who was driving the car, is more culpable in

9    that respect than Mr. McCrimon.  But either way, Mr. McCrimon

10   was involved in activity in furtherance of the underlying crime

11   that was reasonably foreseeable to him, which put others at

12   extreme risk of serious injury.

13           And I'll stop here to note that I believe the sentence

14   for Mr. Sherrod was 77 months.  So that sentence took into

15   account the fact that Mr. Sherrod was driving the car.  My

16   recollection is that in that case, Mr. Sherrod was making an

17   argument, "Well, I shouldn't be held accountable for the note

18   and for the -- you know, for creating the impression that

19   McCrimon had an explosive device."  And on that one, I think

20   you could argue perhaps that Sherrod is less culpable than

21   McCrimon, because McCrimon was the one who was carrying the

22   note and carrying the bag.  But in terms of the get-away,

23   which, arguably, is the worst part of this, even though,

24   technically, he's not -- neither of these defendants is being

25   charged with or convicted of reckless driving, you can make a

1   pretty strong argument that in the entire episode, the worst

2   part of whole thing was the driving part.

3           But that doesn't make it -- I don't want to suggest

4   that bank robbery is not a serious crime.  It is a serious

5   crime.  And I'm just saying that all these things go into

6   consideration here.  One is the seriousness of the offense, two

7   is the use of the note and the bag to create the impression

8   that he had a destructive device, and three is the fact that he

9   should be held accountable for the reckless flight that

10  occurred thereafter.

11          Mr. McCrimon may well -- in fact, I accept at face

12  value that he is a person of limited intellectual capacity.

13  But at the time of the offense, he was a 38-year-old man who

14  certainly knew what he was doing and that what he was doing was

15  wrong.

16          Let's assume, for purposes of this sentencing, that he

17  was not the mastermind; that because of the relative

18  intellectual capacity between Sherrod and McCrimon, it was

19  really Sherrod who was the driving force here, and not

20  McCrimon, and that Sherrod was, in effect, exaggerating

21  McCrimon's role.  But again, I really don't think it matters

22  whose idea it was or who planned it or who orchestrated the car

23  chase.   There is no question that Mr. McCrimon was a central

24  player in this robbery.  He carried the bag, he carried the

25  note, and he needs to be held appropriately accountable for

1    that behavior.

2            The question is:  What does that mean?  What is an

3    appropriate sentence?  And on that point, my view is that if it

4    weren't for the fact that Mr. McCrimon has a number of

5    mitigating factors in his life, such as the fact that he had a

6    terrible upbringing, that he comes from a broken home, that he

7    never even met his father --

8            His father didn't abandon him, in the sense of being

9    there for a while and leaving.  From what I can tell, he never

10   even met his father once in his entire life.

11           -- that he was shuttled between foster homes, that he

12   may well have been the victim of physical abuse or worse, that

13   he has the intellectual ability of -- you know, at the bottom

14   of the chart, so to speak, in terms of IQ, all of that suggests

15   that he has been dealt a rather unfortunate hand in life.  So I

16   am taking that into consideration, and I think that does

17   mitigate the sentence in this case.

18           It's also clear, from the letters that I received from

19   some of the folks here in the courtroom, that Mr. McCrimon is a

20   kind person, a caring person to his family and friends.  So

21   what I will say is that if it were not for this history, his

22   personal history and his personal characteristics, I would

23   impose a sentence closer to the top of the sentencing guideline

24   range and maybe equal to -- after all, both of these guys were

25   involved in this robbery together -- maybe equal to the

1   sentence that I imposed for Sherrod.  And the sentence in that

2   case, as I say, was 77 months.

3         But because of Mr. McCrimon's limited intellectual

4   abilities and his long-standing unaddressed mental health

5   issues and the fact that he was dealt this terrible hand, in

6   light of the fact that he, you know, had this terrible

7   upbringing, and also the fact that others believe him to be a

8   kind and decent and caring person, because of all those things,

9   I believe a sentence at the low end of the sentencing range is

10  sufficient, but not greater than necessary, to satisfy the

11  sentencing objectives as set forth in the statute.

12        So I guess the point is that if it weren't for those

13  things, if it weren't for those mitigating factors, justice

14  would require that I sentence Mr. McCrimon to a sentence

15  roughly the same as the sentence I imposed on Mr. Sherrod.  But

16  I'm not going to do that.  I'm going to sentence him to a jail

17  sentence which is almost a year and a half less -- or more than

18  a year less severe than the sentence I imposed on Mr. Sherrod

19  for the reasons I just said.

20        But I do think that a sentence at the bottom of the

21  guidelines promotes the sentencing objectives of just

22  punishment, respect for the law, protection of the community

23  and general and specific deterrence.  But most importantly, the

24  most important factor is that it satisfies the need for a

25  sentence -- it satisfies the need for the sentence imposed to

1    reflect the seriousness of this offense.  And it's so serious

2    that I just don't believe that the mitigating factors that

3    Mr. Rubin has talked about and the presentence report talks

4    about and that Dr. Goldstein talks about --

5            Is that right?  Dr. Goldstein?  Did I get that right?

6    Yes.

7            -- Dr. Goldstein talks about, I just don't think

8    they're enough to offset the seriousness of the offense, enough

9    such that I could impose a sentence below the guidelines.

10           As I said earlier, the record should be clear that I'm

11   not giving any consideration to the government's assertion that

12   McCrimon did, indeed, participate in the Mount Vernon bank

13   robbery.  And I'll also say for the record, or I'll also say

14   that even if I did not add the one level based on the $15,000

15   loss, I would still sentence Mr. McCrimon to 63 months.  If the

16   guideline range was at Level 24, rather than 25, the sentencing

17   range would be 57 to 71 months, which overlaps with the

18   applicable range in this case, which is 63 to 78 months.  So 63

19   months is in both ranges.  It's at the bottom of the range that

20   I find is applicable, and it's roughly in the middle of the

21   range that would apply if the loss was $10,000, rather than

22   $15,000.  Either way, it's a sentence that I believe is

23   appropriate and sufficient, but not greater than necessary, to

24   satisfy the objectives of the statute.

25           Does either counsel know of any legal reason why the

1  | sentence should not be imposed as stated?

2  | MR. McMAHON:  No, your Honor.

3  | THE COURT:  Mr. Rubin?

4  | MR. RUBIN:  No legal reason, your Honor.

5  | THE COURT:  Mr. McCrimon, can you please stand.

6  | It is the judgment of the Court that you be committed

7  | to the custody of the Bureau of Prisons for 63 months, to be

8  | followed by three years of supervised release.

9  | The standard conditions of supervised release 1 to 13

10 | shall apply.

11 | The following mandatory conditions shall also apply.

12 | They're on Page 23 of the presentence report.  Here they are.

13 | The defendant shall not commit another federal, state

14 | or local crime.

15 | The defendant shall not illegally possess a controlled

16 | substance.

17 | The defendant shall not possess a firearm or

18 | destructive device.

19 | The mandatory drug testing condition is suspended due

20 | to the imposition of a special condition requiring drug

21 | treatment and testing.

22 | And finally, the defendant shall cooperate in the

23 | collection of DNA, as directed by the Probation Officer.

24 | Now, the standard -- I'm sorry.

25 | The following additional --

1          Strike that.

2          The following special conditions shall also apply.

3    They're set forth on Pages 23 and 24 of the presentence report.

4    I'm imposing all of them, except Number 6, which I'll explain

5    in a minute.

6          1.    The defendant shall provide the Probation Officer

7    with access to any requested financial information, because I'm

8    also going to impose restitution in this case.

9          2.    The defendant shall not incur new credit charges

10   or open additional lines of credit without the approval of the

11   Probation Officer, unless the defendant is in compliance with

12   the installment payment schedule which I will set in a minute.

13         3.    The defendant will participate in a program

14   approved by the U.S. Probation Office, which program may

15   include testing to determine whether the defendant has reverted

16   to using drugs or alcohol.  The Court authorizes the release of

17   available drug treatment evaluations and reports to the

18   substance-abuse-treatment provider, as approved by the

19   Probation Officer.  The defendant will be required to

20   contribute to the cost of services rendered -- in other words,

21   a co-payment -- in an amount determined by the Probation

22   Officer, based on his ability to pay or the availability of

23   third-party payment.

24         4.    The defendant shall participate in an alcohol

25   after-care program under a co-payment plan, which may include

1    testing via Breathalyzer, at the direction and discretion of

2    the Probation Officer.

3          5.   The defendant shall participate in a mental health

4    program approved by the U.S. Probation Office.  Defendant shall

5    continue to take any prescribed medications unless otherwise

6    instructed by the healthcare provider.  The defendant shall

7    contribute to the cost of services rendered not covered by

8    third-party payment, if the defendant has the ability to pay.

9    And the Court authorizes the release of available psychological

10   and psychiatric evaluations and reports to the healthcare

11   provider.

12         I'm not imposing the search condition, which is

13   Number 6 in the PSR.  I don't see any basis for imposing that

14   condition, because this case doesn't involve the concealment of

15   drugs or weapons or other contraband.  In fact, there were

16   no -- there was no contraband.  There were no weapons.

17   Certainly, there were no drugs.  So I'm not imposing the search

18   condition.

19         The defendant is to report to the nearest Probation

20   Office within 72 hours of his release from custody.  And it is

21   recommended that the defendant be supervised by his district of

22   residence.

23         I'm not imposing a fine, because I find the defendant

24   does not have the ability to pay a fine.

25         I am imposing restitution in the amount of $10,880.20.

1    And in the PSR and in the previous judgment, I ordered that be

2    payable to EAN Holdings, LLC, 6929 North Lakewood Avenue, Suite

3    100, Tulsa, Oklahoma 74117.  That's joint and several liability

4    with the co-defendant; James Sherrod.

5           I think there was a slightly different name or

6    address.

7           MR. McMAHON:  There was.  EAN Holdings or Enterprise

8    are the same thing.  It's the same company.

9           THE COURT:  So that's acceptable the way it is stated?

10          MR. McMAHON:  Yes.

11          THE COURT:  Okay.  I just wanted to make it consistent

12   with what I did -- I looked at the other judgment, and that's

13   what I did in the other judgment.  Since they're both

14   responsible for the same thing, the payments should be made to

15   the same place.  Okay.

16          Restitution is payable in monthly installments of ten

17   percent of Mr. McCrimon's gross monthly income over the period

18   of supervision, to commence 30 days after his release from

19   custody.  In addition to that, if the defendant is engaged in a

20   BOP non-UNICOR work program, the defendant shall pay $25 per

21   quarter toward the criminal financial penalties, including

22   restitution.  However, if the defendant participates in the

23   BOP's UNICOR program as a Grade 1 through 4, the defendant

24   shall pay 50 percent of his monthly UNICOR earnings toward the

25   criminal financial penalties, consistent with BOP regulations

1 | at 28 CFR Section 545.11.

2 | In addition, there is a mandatory special assessment

3 | of $100. I have no discretion in that matter, so I am imposing

4 | that, and that is due immediately.

5 | The foregoing constitutes the sentence of the Court.

6 | You can have a seat, Mr. McCrimon.

7 | Mr. McCrimon, you have the right to appeal your

8 | sentence, subject to any limitations on that right contained in

9 | your plea agreement with the government. If you are unable to

10 | pay the cost of an appeal, you may apply for leave to appeal

11 | without payment of costs. Now, this is important. If you do

12 | decide to appeal, you have to file a notice of appeal within 14

13 | days after the entry of judgment. Therefore, if you do wish to

14 | appeal, you must advise your attorney to prepare and file a

15 | notice of appeal immediately. Or if you request, the Clerk

16 | will immediately prepare and file a notice of appeal on your

17 | behalf.

18 | Okay. There is an open count, right, Count One?

19 | MR. McMAHON: Yes.

20 | I move to dismiss Count One.

21 | THE COURT: Any objection?

22 | MR. RUBIN: No, Judge.

23 | THE COURT: All right. Count One is dismissed.

24 | Recommendations to the Bureau of Prisons?

25 | I noticed that in Dr. Goldstein's report that he

1       recommended that, upon -- let me just find it -- upon his

2       admission to a federal correctional facility that Mr. McCrimon

3       undergo some psychiatric evaluation.

4               Would you like me to put that as a recommendation in

5       the judgment?  I don't have to.  I won't if you don't want me

6       to.

7               MR. RUBIN:  Can I just have a moment on that?

8               THE COURT:  Sure.

9               (Conference between defendant and attorney)

10              MR. RUBIN:  Yes, Judge.  I think that's a good idea.

11              THE COURT:  Well, I will recommend it.  But my

12      experience with BOP is not that different than yours,

13      Mr. Rubin.  But I will certainly recommend in writing, in the

14      judgment, that upon admission, Mr. McCrimon be evaluated

15      psychiatrically.  Period.

16              MR. RUBIN:  May I ask for one other thing, your Honor?

17              THE COURT:  Sure.

18              MR. RUBIN:  Well, actually, two other things.

19              One, that the Court recommend that he be -- to the

20      extent that the Bureau of Prisons will pay attention to the

21      recommendation, that my client be sent to a facility close to

22      the New York Metropolitan Area or in the New York Metropolitan

23      Area, where he can have visits from his family, which I think

24      are important to him, you know, for a number of reasons.

25              THE COURT:  Yes.  But it's better if I give a specific

1    city.  I'm not sure.  Where was he living before this?

2              MR. RUBIN:  He was living in Brooklyn, I believe.

3              THE COURT:  Brooklyn?

4              MR. RUBIN:  He was living in Brooklyn.  I'm not sure

5    if MDC is necessarily the best place.

6              THE COURT:  No, MDC is really for very short sentences

7    or awaiting transfer.  I'll just say -- recommend in the

8    judgment that he be designated to a facility as close as

9    possible to Brooklyn, New York.

10             MR. RUBIN:  Okay.  That would be good, Judge.

11             THE COURT:  Is that sufficient?

12             MR. RUBIN:  I believe it is.

13             And, Judge, between now and when the judgment is

14   prepared -- and I know you're very efficient -- if I could

15   come -- if there is a facility that I could recommend to the

16   Court, could I ask that the Court include that in the judgment?

17             THE COURT:  Of course.  But I do like to do these

18   things -- and I have certain rule in my chambers that I try to

19   get these things out quickly.

20             By the way, the court has now -- meaning the Southern

21   District Board of Judges has recently passed a new resolution,

22   which I don't think is particularly binding, frankly, but in

23   any event, it strongly encourages all judges to enter the

24   judgment after -- within seven days of sentencing.

25             MR. RUBIN:  Well, I will do it within a day or two,

1  Judge.

2          THE COURT:  The point is, I'll wait up to a week.  If

3  I don't hear from you by a week from today, I'll go ahead and

4  enter the judgment.

5          MR. RUBIN:  Thank you, Judge.

6          THE COURT:  But I won't do it at least until the 21st.

7          MR. RUBIN:  Judge, the only other request I have is,

8  would the Court consider ordering the 500-hour program?  It was

9  clear that he was under the influence of alcohol at the time of

10  this event.

11          THE COURT:  Yes, I'll order it again.

12          A very large majority of all defendants are all

13  sentenced -- defendants going to prison have drug problems, but

14  there is a reference to it in his presentence report, and

15  that's what they look at to determine if he's eligible.  So I

16  will recommend -- I can't order.  I can recommend that the BOP

17  enroll Mr. McCrimon in the 500-hour residential drug use

18  program.  So I will do that.

19          MR. RUBIN:  Thank you, Judge.

20          THE COURT:  Okay.  Anything else that we need to take

21  care of today?

22          MR. McMAHON:  No, your Honor.

23          THE COURT:  And, Mr. Rubin, anything else?

24          (Conference between defendant and attorney)

25          THE COURT:  Anything else Mr. Rubin?

145EMCCmsS                    Sentence

1          MR. RUBIN:  No, your Honor.

2          THE COURT:  Outside of the fact that you may write me

3  a letter about a particular facility.  That's fine.

4          Okay.  Thank you all very much.

5          And good luck to you, Mr. McCrimon.

6          THE DEPUTY CLERK:  All rise.  This Court will be in

7  recess.

8                              -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25